IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EAGLE SEVEN, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| EMILIO VALENTINE, | ) | |
| MATTHEW WOJCIK, AND | ) | |
| RICHARD OSTY, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff Eagle Seven, LLC ("Eagle Seven"), by and through its attorneys, Proskauer Rose LLP, hereby brings this action against Emilio Valentine ("Valentine"), Matthew Wojcik ("Wojcik"), and Richard Osty ("Osty," together with Valentine and Wojcik, the "Defendants").

1.      Eagle Seven, a proprietary commodities trading firm based in Chicago, Illinois, brings this Complaint to address Defendants' brazen breaches of their post-employment restrictive covenants and remarkable acceptance of $10,000 monthly payments each—which they knew Eagle Seven paid under the belief that they were on garden leave and not competing pursuant to their restrictive covenant agreements. This coordinated plot, hatched by Eagle Seven's opportunistic former employees, was calculated to capitalize on Eagle Seven's most sensitive, confidential, proprietary and trade secret information.

2.      Osty and Valentine were both members of Eagle Seven's Equities Desk— a team within Eagle Seven that generated millions of dollars in revenue by trading equities and other asset classes. Wojcik worked closely with the Equities Desk as a

Strategy Developer—a crucial technological role responsible for the software development of trading strategy code that Eagle Seven's Equities Desk was dependent on in order to generate trading revenue. In their respective roles, the Defendants collectively had access to some of Eagle Seven's most sensitive information.

3. Ryan Laning ("Laning") was the primary leader of the plan to raid Eagle Seven. Laning is now the owner of both AKL Capital, LLC ("AKL Capital") and RJL Trading, LLC ("RJL Trading")—both of which are, upon information and belief, Eagle Seven's direct competitors. He is a former equity partner of Eagle Seven, where he was the head of the Equities Trading Desk. He is no stranger to the Defendants, and is keenly aware that Eagle Seven employees associated with the Equities Trading Desk are privy to Eagle Seven's confidential information and trade secrets and are therefore subject to post-employment restrictive covenants, including restrictions on competition and misappropriation of confidential information, just as he was.

4. Laning's raid was set into motion on Friday, April 28, 2023, when Osty resigned his employment, effective immediately. Osty declined to share his future employment plans with Eagle Seven. Osty said he wanted to spend his free time jet-skiing.

5. That following Tuesday, May 2, 2023, Wojcik, a Strategy Developer with deep knowledge of Eagle Seven's proprietary trading systems, strategies and source codes, also abruptly resigned, effective immediately. When asked why he was leaving, Wojcik deceived Eagle Seven by stating he had no plans for future employment, and specifically stated that he would not be working with Laning.

2

6.      Eagle Seven promptly began an investigation and discovered an e-mail that Valentine, an Analyst on the Equities Desk, had sent from his Eagle Seven e-mail account to his personal e-mail account a few weeks prior on April 13, 2023.  The e-mail bore the subject line "RJL," which Eagle Seven would later come to learn was a reference to a new corporate entity – RJL Trading, LLC – formed by Laning on May 4, 2023 for, upon information and belief, purposes of covertly competing with Eagle Seven.

7.      ***Shockingly*, the e-mail thanked Laning for a new employment opportunity and sought advice from Laning regarding: (i) what confidential Eagle Seven trading models Valentine should review in preparation to compete; and (ii) the best way for Valentine to deceive Eagle Seven into thinking he was not resigning to work for another competitor.**

8.      When Valentine was questioned by Eagle Seven management on May 2, 2023, about the e-mail, he falsely stated that he would not be working for Laning or AKL Capital.  Eagle Seven then promptly terminated his employment.

9.      Following their respective separations of employment, each of the Defendants was informed that Eagle Seven intended to enforce their non-competition restrictions.  Although the Defendants were receiving post-termination payments from Eagle Seven in the amount of $10,000 per month to honor their non-competition restrictions, the Defendants never informed Eagle Seven that they had accepted employment with AKL Capital and/or RJL Trading, as they were obligated to do under their restrictive covenant agreements with Eagle Seven.

10.      It was not until June 28, 2023, during a call between the parties' respective

3

counsel, when counsel for AKL Capital revealed that at least Valentine and Wojcik have been working for AKL Capital while collecting their post-termination garden leave payments.

11.     Each of the Defendants had non-competition, employee non-solicitation and confidentiality restrictions in recognition of the sensitive, confidential information and trade secrets they were privy to in their positions of trust at Eagle Seven.

12.     They each breached those restrictions by soliciting each other to begin working for a direct competitor AKL Capital and/or RJL Trading—in an effort to further Laning's goal of recreating the successful Equities Desk he once led.

13.     Further, upon information and belief, the Defendants are working in substantially similar roles to the ones they held at Eagle Seven.  In those positions, it is a foregone conclusion that they will inevitably use, rely upon and/or disclose Eagle Seven's confidential information and trade secrets and thereby irreparably damage Eagle Seven.

14.     In sum, the Defendants' contractual breaches and actual or inevitable misappropriation of Eagle Seven's trade secrets and confidential information will cause Eagle Seven to suffer severe irreparable harm.

## **PARTIES**

15.     Eagle Seven is an Illinois limited liability company headquartered in Chicago, Illinois, and authorized to transact business in Illinois.  It is a proprietary commodities trading firm which trades on exchanges such as the Chicago Mercantile Exchange and the Intercontinental Exchange.

4

16.     Osty was a Junior Trader at Eagle Seven and worked on the Equities Desk. He was employed by the Company from October 28, 2019 through April 28, 2023. Upon information and belief, he currently resides in Chicago, Illinois.

17.     Wojcik was a Strategy Developer at Eagle Seven. He was employed by Eagle Seven from March 8, 2010 through May 2, 2023. Upon information and belief, he currently resides in Chicago, Illinois.

18.     Valentine was an Analyst at Eagle Seven and worked on the Equities Desk. He was employed by Eagle Seven from February 7, 2011 through May 2, 2023. Upon information and belief, he currently resides in Chicago, Illinois.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action seeks to enforce rights and remedies secured under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*

20.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claims, as well as the claim asserted under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq.*

21.     This Court also has personal jurisdiction over Defendants because (i) the agreements that Valentine, Wojcik, and Osty entered into with Eagle Seven and breached, which form the basis of this action, were entered into and performed in Illinois; (ii) Eagle Seven, AKL Capital, and RJL Trading transact business in Illinois; and (iii) the tortious acts alleged herein were committed in Illinois.

22.     Venue in this judicial district is proper by virtue of 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims alleged herein occurred in this judicial district.

## FACTUAL BACKGROUND AS TO ALL COUNTS

**A.      Eagle Seven Relies Heavily On, and Takes
          Steps to Protect, Its Confidential Information**

23.     Eagle Seven utilizes proprietary strategies to generate revenue by trading on exchanges such as the Chicago Mercantile Exchange and the Intercontinental Exchange.

24.     Eagle Seven has invested significant time and resources into researching and developing its proprietary strategies so that it can generate revenue and maintain a competitive business advantage.

25.     It is crucial to Eagle Seven's business interests that its proprietary trading strategies and other sensitive, confidential information and trade secrets remain confidential.  Therefore, Eagle Seven has implemented several security measures to protect such information, including but not limited to: requiring employees to sign confidentiality agreements; implementing security controls limiting access to confidential information, data, and documents based on position and need-to-know; password protections of Eagle Seven computer systems; and the hiring of a full-time network security engineer.

**B.      Ryan Laning Leaves Eagle Seven to Form AKL Capital**

26.     Eagle Seven has several different "desks" or groups, including the Equities Desk, which trades equities and other asset classes.  Over the last decade, the

6

Equities Desk has generated tens of millions of dollars' worth of revenue for Eagle Seven.

27.     Laning is a former equity partner at Eagle Seven, and up until his departure from the firm in May 2021, he was Eagle Seven's Head of Equity Trading.  In that role, he was tasked with developing, implementing and operating Eagle Seven's trading strategies in both equity and futures markets.

28.     As a former equity partner of Eagle Seven, Laning was aware that his colleagues on the Equities Desk (i) had access to Eagle Seven's confidential and proprietary information; and (ii) were subject to post-employment restrictive covenants, including restraints on solicitation and misappropriation of Eagle Seven confidential information.

29.     Laning was subject to a non-solicitation restrictive covenant which prohibited him from soliciting Eagle Seven employees for a period of eighteen months.

30.     Three months after Laning's separation from Eagle Seven, in or about July 2021, Laning informed Eagle Seven that he was launching a hedge fund called AKL Capital, which is based in Chicago, Illinois.  Laning is currently AKL Capital's Chief Investment Officer.

31.     Laning initially solicited several Eagle Seven employees to invest in AKL Capital.  After experiencing a poor financial performance in 2022, however, Laning suddenly returned those Eagle Seven employees' capital investments and excluded them from the fund.

32.     Upon information and belief, Laning excluded those Eagle Seven employees from the fund to eliminate their visibility into AKL Capital's business decisions.

33.     Upon information and belief, AKL Capital has changed strategy and is going to be a direct competitor of Eagle Seven; it competes in the same market and, as described below, appears to be positioning itself to execute a similar trading strategy.

34.     According to AKL Capital's website, its trading activities involve "domestic equities, futures and options" and use a "quantitative investment approach." https://www.akl-capital.com/strategy.

**C.      The Individual Defendants and Their Restrictive Covenants**

       **a.  Richard Osty**

35.     Osty was a Junior Trader at Eagle Seven and worked on the Equities Desk. He was employed by Eagle Seven from October 28, 2019 through April 28, 2023.

36.     As a Junior Trader at Eagle Seven, Osty had access to sensitive, confidential information, including but not limited to Eagle Seven's proprietary trading strategies and models, financial performance metrics, and information about the firm's contacts and relationships within the industry.

37.     Given Osty's access to such confidential information, and in order to protect its business interests, Eagle Seven required Osty to enter into a Restrictive Covenant and Employee Work Made for Hire Agreement ("Agreement"). Osty executed this Agreement when he began his employment with Eagle Seven on or about October

28, 2019. A true and correct copy of the Agreement, executed by Osty, is attached as **Exhibit 1**.

38. Paragraph 4.1 of the Agreement prohibits Osty from, for a period of twelve months from his termination date, soliciting other Eagle Seven employees to terminate their employment relationship with Eagle Seven. Specifically, Osty agreed that he would not, directly or indirectly, alone or in combination with any other individual, enterprise or entity, engage in any of the following:

> (a) solicit, employ or engage in any capacity (whether as an employee, consultant, owner, member, independent contractor or otherwise) any "Covered Employee." A "**Covered Employee**" means any individual who is or was, within the six-month period prior to such solicitation, employment, or engagement, employed or otherwise engaged by the Company or any of its affiliates in any capacity (whether as an employee, consultant, owner, member, independent contractor or otherwise);
>
> … or
>
> (b) interfere with, alter, or attempt to interfere with or alter, any relationship between the Company or any of its affiliates and any individual, enterprise or entity referred to in Sections 4.l(a) and 4.l(b) above.

39. In addition, Paragraph 4.2 of the Agreement contains a non-competition provision, which provides that for a period of ten months from the employee's termination date, he would not, directly or indirectly, engage in any of the following "Competitive Activities":

> (i) engage in the Business[1]; or

---

[1] "Business" is defined in the Agreements to mean (i) engaging in the business of acquiring, disposing of, spreading, arbitraging and otherwise trading, whether long or short or directly or indirectly in any security, commodity, futures contract, security futures contract, forward contract, foreign exchange commitment, swap contract, exchange-for-physical, or spot (cash) commodity, option, warrant or other right on or pertaining to any of the foregoing or any other financial product or financial instrument

(ii) render services to or with, or otherwise assist, any individual, enterprise or entity that engages in, or plans to engage in, the Business (a "Competitive Entity"), or otherwise enter into a business relationship with or own, operate or manage a Competitive Entity or perform any services or otherwise assist any Competitive Entity in anticipation of engaging in any of the foregoing[.]

40.     Moreover, prior to becoming employed or engaged by, or otherwise providing services to, any individual or entity engaged in the financial markets, Paragraph 5 of the Agreement mandates that the employee shall:

(i) disclose the existence and the terms of the Restrictive Covenants and the prohibition on Employee's disclosure and use of the Work and Confidential Information set forth herein to any future employer or other individual, enterprise or entity to which Employee may provide services, and

(ii) at least five (5) business days prior to commencing any such new employment or engagement, notify the Company of the identity of Employee's employer or other individual or entity to which Employee may provide services and supply a general description of Employee's new job and duties . . . .

**b. Matthew Wojcik**

41.     Wojcik was a Strategy Developer at Eagle Seven.  He was employed by Eagle Seven from March 8, 2010 through May 2, 2023.

---

employing a trading strategy similar to any trading strategy employed or actively planned to be employed by the Company or any of its affiliates during the period in which Employee was employed by the Company, (ii) the creation, development, implementation, distribution, ownership or exploitation of intellectual property and/or technology (including, but not limited to, trading infrastructure, databases, trading strategies, algorithms and software) for use in connection with trading or other activities related to any trading strategy similar to any trading strategy employed or actively planned to be employed by the Company or any of its affiliates during the period in which Employee was employed by the Company, and (iii) any other business activity that the Company or any of its affiliates engaged in, or actively planned to engage in, during the period in which Employee was employed by the Company.

42.     Wojcik was a longtime employee at Eagle Seven, and had worked with Laning for many years prior to Laning's departure from the firm in May 2021.  During that time, Wojcik and Laning developed a close working relationship.

43.     As a Strategy Developer, Wojcik was considered a key employee at Eagle Seven and his job duties involved several important responsibilities.

44.     One of Wojcik's most important responsibilities was to write code in Eagle Seven's proprietary trading system, which necessarily gave him intimate and detailed access to Eagle Seven's confidential information.

45.     Indeed, the code Wojcik wrote (and code written by others, which Wojcik had access to) constituted Eagle Seven's confidential information and was used to facilitate the submission of trade orders, develop pricing models and execution logic, engage in risk management, and create custom visual tools to aid Eagle Seven's trading. Much of this code was developed through years of trial, error, and iterative improvements.

46.     Due to Wojcik's numerous and significant back-end responsibilities, he had nearly unfettered access to Eagle Seven's most sensitive and confidential information, including but not limited to: Eagle Seven's confidential and profitable trading strategies on various exchanges—knowledge of which could be replicated elsewhere; Eagle Seven's proprietary technology, including future plans for implementation of such technology and next-generation designs; Eagle Seven's core trading system, including unique enhancements that give Eagle Seven's system advantages over its competitors; other proprietary enhancements to Eagle Seven's

technology that required years of research and development to establish, but can be easily replicated and transferable to competitors; and Eagle Seven's financial performance metrics, including the profitability of each group within the firm and the firm's overall financial successes.

47.     In light of Wojcik's level of access to Eagle Seven's confidential and proprietary information, and to protect its business interests, Eagle Seven required Wojcik to enter into a nearly identical copy of the Agreement.  A true and correct copy of the Restrictive Covenant and Employee Work Made for Hire Agreement that Wojcik entered into on March 8, 2010, is attached as **Exhibit 2**.

48.     The agreement Wojcik executed contained similar non-compete and non-solicitation restrictions as the Agreement Osty executed.

49.     Paragraph 4.2 of the agreement that Wojcik executed, however, extends to twelve months in duration if the employee:

> proposes to engage in a Competitive Activity directly with a Covered Employee, or render services to a Competitive Entity that engages (whether as an employee, independent contractor, consultant, owner or otherwise) any Covered Employee (excluding administrative and clerical employees) in the Business, then the Non-Competition Restricted Period shall be deemed to end on the 12-month anniversary of the Termination Date with respect to such Competitive Activity.

### c.  Emilio Valentine

50.     Valentine was an Analyst at Eagle Seven and worked on the Equities Desk.  He was employed by Eagle Seven from approximately February 7, 2011 through May 2, 2023.

12

51.     As an Analyst, Valentine had access to sensitive, confidential information, including but not limited to Eagle Seven's proprietary trading strategies and models, financial performance metrics, and information about the firm's contacts and relationships within the industry.  Valentine also interacted with other groups within Eagle Seven and learned of their operations and business strategies.

52.     Given Valentine's access to such confidential information, and to protect its business interests, Eagle Seven required Valentine to enter into a nearly identical copy of the Agreement.  A true and correct copy of the agreement Valentine executed on February 3, 2011, is attached as **Exhibit 3**.

53.     The agreement Valentine executed contained the same non-compete and non-solicitation restrictions as the agreement Wojcik executed.

**D.     Osty, Wojcik, and Valentine Abruptly Depart from Eagle Seven**

54.     Upon information and belief, in April 2023, Laning began executing a targeted raid on Eagle Seven's employees working on its Equities Desk who had access to confidential and proprietary information regarding the firm's trading strategies.

**a.  Osty Abruptly Resigns**

55.     On Friday, April 28, 2023, Osty abruptly resigned his employment with Eagle Seven, effective immediately.

56.     Nicholas Mirzabegian ("Mirzabegian"), Eagle Seven's Chief Financial Officer, conducted an exit interview with Osty.  During the exit interview, Osty refused to disclose his future employment plans.  Osty stated that he wanted to spend his free time jet-skiing.

57.     Osty was informed that Eagle Seven would be enforcing his restrictive covenants, including his non-compete and non-solicitation obligations.  Specifically, Osty received a letter dated May 1, 2023, with the subject line: "Non-Competition Election Notice & Continuing Obligations."  The letter formally notified Osty that Eagle Seven had elected to enforce the Agreement's non-competition provision, and also reminded him of his other continuing obligations, including his non-solicitation and confidentiality obligations.  A true and correct copy of the Non-Competition Election Notice & Continuing Obligations Letter, dated May 1, 2023, is attached as **Exhibit 4**.

### b. Wojcik Resigns Two Business Days After Osty

58.     Only two business days after Osty's sudden, unexplainable resignation, Wojcik resigned from Eagle Seven on May 2, 2023, effective immediately.

59.     On May 2, 2023, Mirzabegian conducted an exit interview with Wojcik. During the exit interview, Wojcik stated that he resigned because he needed time off from work.  He also stated that he had no plans for future employment.  Wojcik denied that he was going to work with Laning.

60.     Wojcik was informed that Eagle Seven would be enforcing his restrictive covenants, including his non-compete and non-solicitation obligations.  Specifically, Wojcik received a letter from Eagle Seven dated May 4, 2023, with the subject line: "Non-Competition Election Notice & Continuing Obligations."  This letter formally notified Wojcik that Eagle Seven had elected to enforce the Agreement's non-competition provision, and also reminded him of his other continuing obligations, including his non-solicitation and confidentiality obligations.  A true and correct copy of

14

the Non-Competition Election Notice & Continuing Obligations Letter, dated May 1, 2023, is attached as **Exhibit 5**.

### c. Valentine Is Terminated After Eagle Seven Discovers That He Was Covertly Preparing to Work for a New Competitive Entity Formed by Laning

61.     Following the abrupt and temporally close departures of Osty and Wojcik, Eagle Seven began a prompt investigation.

62.     Eagle Seven discovered an e-mail dated April 13, 2023, with the subject line "RJL," which Valentine had sent from his Eagle Seven e-mail account to his personal Gmail account.

63.     Of particular concern, on May 4, 2023, Laning registered a new entity with the State of Illinois bearing the name "RJL Trading, LLC," *i.e.*, the same entity referred in the subject line of Valentine's e-mail.  According to the Illinois Secretary of State records, the entity is registered to the exact same address and office suite as AKL Capital.

64.     Upon information and belief, RJL Trading, which has no readily apparent online presence, was set up for purposes of covertly competing with Eagle Seven.

65.     In the April 13, 2023 e-mail, which was clearly intended for Laning, Valentine:

(i)     Thanked Laning for reaching out to him via text message about a new job opportunity; and

15

(ii)     Asked Laning is there was anything he could do while still employed at Eagle Seven in preparation for working for Laning, including, among other things, reviewing confidential Eagle Seven trading models.

66.     Moreover, in that e-mail, Valentine emphasized to Laning that he was "selling" a "story" to Eagle Seven (*i.e.*, deceiving Eagle Seven) regarding his departure from the firm.

67.     Further, Valentine explained to Laning that remaining employed at Eagle Seven until he received a bonus payment "ma[d]e more sense [versus] [him] leaving and not taking the money," because "not taking the money" would make it appear to Eagle Seven that he was "starting another job."

68.     After the e-mail was discovered, Mirzabegian met with Valentine on May 2, 2023.  During the meeting, Valentine denied that he was planning to resign from Eagle Seven to work for Laning.  Valentine also refused to provide direct answers in response to questions about the e-mail.

69.     Valentine was given the option to resign or be terminated.  Valentine refused to resign, and so his employment with Eagle Seven was terminated.

70.     Valentine was informed that that Eagle Seven would be enforcing his restrictive covenants, including his non-compete and non-solicitation obligations. Specifically, Valentine received a letter from Eagle Seven dated May 4, 2023, with the subject line: "Non-Competition Election Notice & Continuing Obligations."  This letter formally notified Valentine that Eagle Seven had elected to enforce the Agreement's non-competition provision, and also reminded him of his other continuing obligations,

including his non-solicitation and confidentiality obligations.  A true and correct copy of the Non-Competition Election Notice & Continuing Obligations letter, dated May 4, 2023, is attached as **Exhibit 6**.

### E. Eagle Seven Obtains Confirmation of the Defendants' Breaches of Their Restrictive Covenants

71.     Notwithstanding their respective separations of employment, each of the Defendants was receiving post-termination payments from Eagle Seven in the amount of $10,000 per month to honor their non-competition restrictions.

72.     Despite receiving those payments, upon information and belief, none of the Defendants informed Eagle Seven that they had accepted employment with AKL Capital and/or RJL Trading, as they were obligated to under Paragraph 5 of the Agreement.

73.     Instead, on a call between counsel for the parties on June 28, 2023, counsel for AKL Capital revealed that at least Valentine and Wojcik had already begun working for AKL Capital.

74.     Each of the Defendants agreed to non-competition, employee non-solicitation, and confidentiality restrictions in recognition of the sensitive, confidential information and trade secrets they had access to in their positions of trust at Eagle Seven.

75.     Upon information and belief, each of the Defendants breached their Agreements by soliciting each other in a coordinated scheme to join AKL Capital and/or RJL Trading, as Laning attempts to replicate the successful Equities Desk he once oversaw at Eagle Seven.

76.     Upon information and belief, the Defendants are working in substantially similar roles to the ones they had at Eagle Seven.  In those positions, it is a foregone conclusion that they will inevitably use, rely upon and/or disclose Eagle Seven's confidential information and trade secrets and thereby irreparably damage Eagle Seven.

## Count I

### (Breach of Contract – Non-Competition
### as Against All Defendants)

77.     Eagle Seven repeats and realleges each of the allegations heretofore pled.

78.     The Agreements are enforceable contracts between the parties.

79.     The Agreements impose post-separation non-compete obligations upon the Defendants that are reasonable and necessary to protect Eagle Seven's legitimate business interests; impose no undue hardship on; and are not injurious to the public.

80.     The global scale of Eagle Seven, AKL Capital, and RJL Trading's respective business operations, the directly competitive nature of the Defendants' work for AKL Capital and/or RJL Trading, and the Defendants' understanding and agreement to the terms and conditions of the Agreements reflect that the territorial limitation of their non-competition restrictive covenants are reasonable.

81.     The brevity of the ten- to twelve-month duration of the Defendants' non-competition restrictive covenants further indicates that the restrictions are reasonable.

82.     The Defendants' aforesaid actions constitute material breaches of the Agreements.

18

83.     As a direct and proximate result of Wojcik, Valentine, and upon information and belief, Osty's breaches of the Agreements, the Defendants caused and will continue to cause Eagle Seven to suffer irreparable injury if not immediately restrained.

84.     Eagle Seven, therefore, is entitled to an injunction prohibiting the Defendants' continued breach of their Agreements; judgment against the Defendants for compensatory damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other further relief as the Court deems fair, just and equitable.

## **Count II**

### **(Breach of Contract – Non-Solicitation as Against All Defendants)**

85.     Eagle Seven repeats and realleges each of the allegations heretofore pled.

86.     The Agreements are enforceable contracts between the parties.

87.     The Agreements impose post-separation non-solicitation obligations upon the Defendants that are reasonable and necessary to protect Eagle Seven's legitimate business interests; impose no undue hardship on; and are not injurious to the public.

88.     The global scale of Eagle Seven, AKL Capital, and RJL Trading's respective business operations, the directly competitive nature of the Defendants' work for AKL Capital and/or RJL Trading, and the Defendants' understanding and agreement to the terms and conditions of the Agreements reflect that the territorial limitation of their non-competition restrictive covenants are reasonable.

89.     By signing the Agreements, the Defendants acknowledged the global nature of Eagle Seven's business operations, and that the obligations imposed on them were fair, reasonable, and necessary.

90.     The brevity of the twelve-month duration of the Defendants' non-solicitation restrictive covenants further indicates that the restrictions are reasonable.

91.     The Defendants' aforesaid actions constitute material breaches of the Agreements.

92.     Upon information and belief, the Defendants engaged in a coordinated scheme to solicit each other to join AKL Capital and/or RJL Trading.

93.     Upon information and belief, the Defendants' solicitation is evidenced by the abrupt and temporally proximate nature of their departures from Eagle Seven.

94.     Upon information and belief, as a direct and proximate result of the Defendants' breaches of the Agreements, the Defendants caused and will continue to cause Eagle Seven to suffer irreparable injury if not immediately restrained.

95.     Eagle Seven, therefore, is entitled to an injunction prohibiting the Defendants' continued breach of their Agreements; judgment against the Defendants for compensatory damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other further relief as the Court deems fair, just and equitable.

## Count III

### (Violation of Illinois Trade Secrets Act
### as Against All Defendants)

96. Eagle Seven repeats and realleges each of the allegations heretofore pled.

65. Eagle Seven's confidential, proprietary and trade secret information, including its new business plans, codes, financial information, confidential trading strategies, investment models, and trading algorithms, constitutes trade secrets within the meaning of the ITSA because its secrecy gives Eagle Seven an economic advantage over competitors, it was imparted to the Defendants for the sole purpose of facilitating their work for Eagle Seven, it is not generally available to the public, it was kept secure and strictly confidential, and would not have been known to the Defendants but for their employment with Eagle Seven.

66. The Defendants had access to Eagle Seven's confidential and trade secret information.

67. This confidential and trade secret information was created for the sole use and benefit of Eagle Seven, at its significant expense, and was solely owned, developed, and controlled by Eagle Seven.

68. At all times relevant herein, Eagle Seven took adequate and reasonable precautions to maintain the secrecy of its confidential and trade secret information, and the Defendants were never given permission by Eagle Seven to remove, retain, disclose, copy, download, or misuse any of its confidential information.

69. Wojcik, Valentine, and upon information and belief, Osty, have already begun work for AKL Capital and/or RJL Trading, both of which are, upon information

and belief, direct competitors with Eagle Seven, performing substantially similar roles as they did for Eagle Seven.

70.     Upon information and belief, the Defendants will inevitably disclose, rely upon, exploit, and/or misuse Eagle Seven's confidential and trade secret information.

71.     The Defendants would never have gained access to Eagle Seven's confidential and trade secret information had the Defendants not been employed by Eagle Seven.

72.     On information and belief, Eagle Seven's trade secrets were acquired by the Defendants through willful, malicious and improper means for the benefit of the Defendants, AKL Capital, and/or RJL Capital.

73.     Wojcik, Valentine, and upon information and belief, Osty, will rely, and cannot help but rely, upon their knowledge of Eagle Seven's trade secrets in performing their jobs with AKL Capital and/or RJL Trading because they will have essentially the same duties and responsibilities with these Eagle Seven competitors as they had for Eagle Seven.

74.     Upon information and belief, the Defendants could not operate or function in their new positions with AKL Capital and/or RJL Trading without relying on Eagle Seven's trade secrets.

75.     Upon information and belief, Osty, as well as Wojcik and Valentine, inevitably will profit and gain an economic advantage from their unauthorized use, disclosure, reliance upon and misappropriation of Eagle Seven's confidential and trade secret information.

76. Upon information and belief, Osty, as well as Wojcik and Valentine's, actions constitute a willful and malicious violation of the ITSA.

77. As a direct and proximate result of the Defendants' misappropriation of Eagle Seven's confidential and trade secret information, Eagle Seven has no adequate remedy at law to compensate it for the loss of its trade secrets, has been irreparably harmed and is entitled to an order compelling the immediate return of all of Eagle Seven's confidential information and all derivations thereof; and judgment against Defendants for compensatory damages; punitive damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other and further relief as the Court deems fair, just, and equitable.

## <u>Count IV</u>

### (Violations of the Defend Trade Secrets Act as Against All Defendants)

78. Eagle Seven repeats and realleges each of the allegations heretofore pled.

79. Eagle Seven's confidential, proprietary and trade secret information, including its new business plans, codes, financial information, confidential trading strategies, investment models, and trading algorithms, constitutes trade secrets within the meaning of the DTSA because its secrecy gives Eagle Seven an economic advantage over competitors, it was imparted to the Defendants for the sole purpose of facilitating their work for Eagle Seven, it is not generally available to the public, it was kept secure and strictly confidential, and it would not have been known to the Defendants but for their employment with Eagle Seven.

80. The Defendants had access to Eagle Seven's confidential and trade secret information.

23

81. This confidential and trade secret information was created for the sole use and benefit of Eagle Seven, at its significant expense, and was solely owned, developed, and controlled by Eagle Seven.

82. At all times relevant herein, Eagle Seven took adequate and reasonable precautions to maintain the secrecy of its confidential and trade secret information, and the Defendants were never given permission by Eagle Seven to remove, retain, disclose, copy, download, or misuse any of its confidential information.

83. Wojcik and Valentine, and upon information and belief, Osty, have already begun work for AKL Capital and/or RJL Trading, both of which are direct competitors with Eagle Seven, performing a substantially similar role as they did for Eagle Seven.

84. Upon information and belief, the Defendants will inevitably disclose, rely upon, exploit, and/or misuse Eagle Seven's confidential and trade secret information.

85. The Defendants would never have gained access to Eagle Seven's confidential and trade secret information had they not been employed by Eagle Seven.

86. On information and belief, Eagle Seven's trade secrets were acquired by the Defendants through willful, malicious and improper means for the benefit of the Defendants, AKL Capital, and/or RJL Trading.

87. Upon information and belief, Osty, as well as Wojcik and Valentine's, actions constitute a willful and malicious violation of the DTSA.

88. Wojcik, Valentine, and upon information and belief, Osty, will rely, and cannot help but rely, upon their knowledge of Eagle Seven's trade secrets in performing their jobs with AKL Capital and/or RJL because they will have essentially the same

duties and responsibilities with these Eagle Seven competitors as they had for Eagle Seven.

89.     Upon information and belief, the Defendants could not operate or function in their new positions with AKL Capital and/or RJL Trading without relying on Eagle Seven's trade secrets.

90.     Upon information and belief, Osty, as well as Wojcik and Valentine, inevitably will profit and gain an economic advantage from their unauthorized use, disclosure, reliance upon and misappropriation of Eagle Seven's confidential and trade secret information.

91.     As a direct and proximate result of Defendants' misappropriation of Eagle Seven's confidential and trade secret information, Eagle Seven has no adequate remedy at law to compensate it for the loss of its trade secrets, has been irreparably harmed and is entitled to an order compelling the immediate return of all of Eagle Seven confidential information and all derivations thereof; and judgment against Defendants for compensatory damages; punitive damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other and further relief as the Court deems fair, just, and equitable.

## Count V

### (Tortious Interference with Contract
### as Against All Defendants)

92.     Eagle Seven repeats and realleges each of the allegations heretofore pled.

93.     Eagle Seven has an economic interest in maintaining the integrity of its non-competition agreements with the Defendants.

94.     The Agreements are enforceable contracts between the parties.

95.    Each Defendant knew or should have known that the other Defendants had enforceable non-competition and non-solicitation agreements with Eagle Seven.

96.    Upon information and belief, by their direct and/or indirect acts of commission and/or omission, each Defendant induced, solicited, and/or encouraged the other Defendants to breach their contracts with Eagle Seven in order to benefit AKL Capital and/or RJL Trading at Eagle Seven's expense.

97.    Upon information and belief, the direct and/or indirect acts of commission and/or omission of each Defendant aided and/or abetted the other Defendants in the breach of their contracts with Eagle Seven.

98.    As a direct and proximate result of the acts and/or omissions of the Defendants, the Defendants caused and will continue to cause Eagle Seven to suffer irreparable injury and financial harm if not immediately restrained.

99.    Eagle Seven, therefore, is entitled to an injunction prohibiting the Defendants' continued tortious conduct; and to judgment against the Defendants for compensatory damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other and further relief as the Court deems fair, just, and equitable.

## Count VI

### (Unjust Enrichment
### as Against Wojcik and Valentine)

100.    Eagle Seven repeats and realleges each of the allegations heretofore pled.

101.    Eagle Seven conferred post-employment benefits upon Wojcik and Valentine by paying them $10,000 per month to honor their non-competition restrictions.

102.    These $10,000 monthly payments were not governed by Wojcik and Valentine's respective agreements with Eagle Seven.

103.     Eagle Seven believed that, at the time Wojcik and Valentine each accepted such payments, they were honoring their non-competition restrictions.

104.     Eagle Seven subsequently learned, however, that despite accepting these payments, Wojcik and Valentine had already started working for AKL Capital and/or RJL Trading.

105.     Wojcik and Valentine's acceptance and retention of the $10,000 monthly payments, while concealing the fact that they had already started working for AKL Capital and/or RJL Trading, violates the fundamental principles of justice, equity, and good conscience.

106.     Eagle Seven has been damaged by Wojcik and Valentine's retention of the $10,000 monthly payments.

107.     It would be inequitable for Wojcik and Valentine to retain the payments they received without repaying Eagle Seven.

**Count VII**

**(Breach of Contract – Restricted Period Payments
as Against Osty)**

108.     Eagle Seven repeats and realleges each of the allegations heretofore pled.

109.     Osty's Agreement with Eagle Seven is an enforceable contract.

110.     Paragraph 4.2(b) of the Agreement entitles Osty to monthly payments, not to exceed $10,000, for a period of ten months following the separation of his employment with Eagle Seven, so long as Osty does not, directly or indirectly, engage in any competitive activity (as defined by the Agreement) during that ten-month period.

111.     On April 28, 2023, Osty voluntarily resigned from Eagle Seven.

112.    Following Osty's resignation, and in accordance with its obligations under Paragraph 4.2(b) of the Agreement, Eagle Seven paid Osty $10,000 per month.

113.    Upon information and belief, Osty accepted these monthly payments despite having already begun working for AKL Capital and/or RJL Trading—*i.e.*, a direct competitor of Eagle Seven.

114.    Upon information and belief, Osty's aforesaid actions constitute material breaches of the Agreement.

115.    Upon information and belief, as a direct and proximate result of Osty's breach of the Agreement, Osty caused and will continue to cause Eagle Seven to suffer irreparable injury if not immediately restrained.

116.    Eagle Seven, therefore, is entitled to an injunction prohibiting Osty's continued breach of his Agreement; judgment against Osty for compensatory damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other further relief as the Court deems fair, just and equitable.


**WHEREFORE**, Eagle Seven respectfully requests that the Court:

a)    Grant Eagle Seven final judgment against Defendants for all actual, compensatory, and punitive damages, as well as other damages to be determined at trial, together with pre-judgment and post-judgment interest.

b)    Enter a preliminary injunction and permanent injunctive relief against Defendants to enjoin the from engaging in the conduct complained of herein.

       c)      Grant Eagle Seven final judgment against Defendants for all allowable costs, attorney's fees, and other litigation expenses to the extent recoverable under their Agreements and applicable law.

       d)      Grant Eagle Seven such other and further relief that the Court deems may be just, equitable, and proper.

Dated: July 12, 2023

Respectfully submitted,

**EAGLE SEVEN, LLC**

By: /s/ *Steven J. Pearlman*
          One of its Attorneys

Steven J. Pearlman
Edward C. Young
PROSKAUER ROSE LLP
70 W. Madison, Suite 3800
Chicago, Illinois 60602
Phone: (312) 962-3550
Fax: (312) 962-3551

*Attorneys for Plaintiff Eagle Seven, LLC*